## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **TERRY SLAYTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:07-CV-80** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Terry Slayton appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be REVERSED AND REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Slayton applied for DIB on May 28, 2003, alleging that he became disabled as of September 12, 2002.  (Tr. 12, 53-55.)  The Commissioner denied his application initially and upon reconsideration.  (Tr. 30-31, 37-39, 41-45.)  On February 9, 2006, Administrative Law Judge (ALJ) John S. Pope conducted a hearing at which Slayton, who was represented by counsel, Slayton's sister, and a vocational expert ("VE") testified.  (Tr. 280-322.)  On September 27, 2006, the ALJ rendered an unfavorable decision to Slayton.  (Tr. 9-19.)  Slayton submitted a request for review to the Appeals Council, which was denied, making the ALJ's second decision the final decision of the Commissioner. (Tr. 4-8.)

---

[1]All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

Slayton filed a complaint with this Court on April 6, 2007, seeking relief from the Commissioner's final decision.  (Docket # 1.)  He argues that the ALJ improperly evaluated his symptom testimony and the opinion of his treating psychiatrist, Dr. Varma.  (Opening Br. in Soc. Sec. Appeal ("Opening Br.") 20, 23.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Slayton was forty-eight years old, had a high school education, and had work experience as a machine helper, warehouse worker, driver, and painter. (Tr. 53, 69, 143, 315-16.)  In Slayton's DIB application, he alleged mental illness, which is later described in counsel's brief as "major depressive disorder with psychotic features and personality disorder."  (Tr. 63; Opening Br. 2.)

### B.  Summary of the Relevant Medical Evidence

#### 1.  Dr. Anthony Hall, November 29, 2000 to March 20, 2003

The earliest record of Slayton's mental health history begins on November 29, 2000, with Slayton's visit to Dr. Anthony Hall, who diagnosed him with adjustment disorder and mixed anxiety.  (Tr. 147.)  Slayton visited Dr. Hall two more times in 2001 and once in 2003.  (Tr. 144-46.)  Dr. Hall's diagnoses in 2001 included adjustment disorder and stress related increase in blood pressure (discussing problems at work), and his 2003 notes indicated adjustment disorder and a problem with anger.  (Tr. 144-46.)

#### 2.  Dr. Joy Baker, Consultative Mental Status Exam on July 16, 2003

---

[2] The administrative record in this case is voluminous (322 pages), and the parties' disputes involve only small portions of it, that is, the ALJ's decision to give little weight to the opinion of Slayton's treating physician, and his finding that Slayton's symptom testimony was not entirely credible.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

Dr. Joy Baker, Clinical Psychologist, conducted a consultative mental status exam for the state agency in July 2003.  (Tr. 152-56.)  She observed that Slayton was "pleasant and cooperative but got paranoid easily."  (Tr. 152.)  She recounted Slayton's tale of being "ripped off" by the judge and attorney in his discrimination suit against a former employer, and how he has suffered depression from three years of stress.  (Tr. 152.)  Slayton told Dr. Baker, "I need counseling and I can't pay for it.  I have an anger problem.  I'm not trusting anyone."  (Tr. 152.)

Dr. Baker described Slayton's mood and affect as "very agitated and threatening . . . . indicating that if someone did something that he considered racist, he would not be accountable for his actions."  (Tr. 154.)  Dr. Baker recounted Slayton's statements that he "sees things crawling on the wall or somebody coming in the house or . . . something splashing."  (Tr. 154.)  Ultimately, she diagnosed him with major depressive disorder, single episode, severe with psychotic features, and intermittent explosive disorder, and assessed his Global Assessment of Functioning (GAF) at thirty-nine.[3]  (Tr. 155-56.)  She also noted that Slayton was on Zoloft but had no money for treatment.  (Tr. 156.)  Dr. Baker further stated that Slayton had a bad attitude and would have difficulty getting along with employees and employers.  (Tr. 156.)

### 3.  Therapist Kathy Hunt, ACSW, LCSW, Assessment on August 14, 2003

Slayton visited Ms. Hunt at the Southwestern Indiana Mental Health Center, Inc., on August 14, 2003, for an assessment to determine whether he had a psychiatric disability

---

[3]The Global Assessment of Functioning Scale is used by physicians to report the individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32-34 (4th ed. Text Revision 2000) (hereinafter "DSM-IV-TR").  A GAF score of 39 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id.*

qualifying him for Medicaid.  (Tr. 269.)  Ms. Hunt observed that Slayton was neat and clean,

appropriately dressed, and oriented.  (Tr. 270.)  He admitted to thoughts of suicide and homicide

but denied that he would act, and Ms. Hunt also noted that he "sometimes sees something and

knows that others don't see it."  (Tr. 270.)

Ms. Hunt diagnosed Slayton with adjustment disorder with mixed disturbance of

emotions and conduct, with "development of emotional and behavioral symptoms in response to

issues with his last employment[,]" and alcohol abuse.  (Tr. 270.)  She assessed his GAF at forty-

five.[4]  (Tr. 270.)

### 4. Dr. William Weiss, Consultative Mental Status Exam on September 12, 2003

Dr. William Weiss examined Slayton in September 2003 and conducted a mental status

exam and the MMPI-2.  (Tr. 157-64.)  He noted that Slayton "sometimes sees things and hears

voices," but was not sure about them because "[s]o many people live around [him.]"  (Tr. 158.)

Dr. Weiss considered Dr. Baker's Mental Status Exam and Slayton's daily activities,

noting that Slayton works in the garden when his shoulder does not bother him, cleans his house,

and hardly goes anywhere.  (Tr. 160-61.)  He administered the MMPI-2, and the results

suggested that Slayton "overendorsed pathological items[,]" but the doctor acknowledged that

Slayton's paranoia "may have been a factor in the way he responded[.]"  (Tr. 162.)  He found

Slayton's profile consistent with paranoid schizophrenic diagnosis.  (Tr. 162.)  Dr. Weiss

admonished, "Of course, it is not a valid profile and must be interpreted cautiously[,]" noting

that his profile would also not be inconsistent with the earlier diagnoses of major depressive

disorder, recurrent, moderate, and paranoid personality disorder, and which was his ultimate

---

[4]A GAF score of forty-five indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 34.

diagnosis.  (Tr. 162-63.)  He assessed Slayton's current GAF and highest GAF over the past year at forty-five.[5]

Dr. Weiss stated that Slayton needs treatment, and although Slayton did not believe the Zoloft helped him, other medicines might.  (Tr. 164.)  Dr. Weiss wrote, "Slayton has a long history of mental health problems.  His paranoia has prevented him from being successfully treated in the past. . . . His problems are likely to be long term.  Prognosis is guarded."  (Tr. 164.)

### 5.  Parkview Behavioral Health, March 2, 2004 to March 5, 2004

On March 2, 2004, Slayton voluntarily presented himself in the emergency department of Parkview Behavioral Health, complaining of suicidal and homicidal thoughts.  (Tr. 259.)  He stated that he heard voices that told him to kill himself, and that he was also having thoughts of killing his ex-girlfriend, his attorney, and the judge in his prior discrimination case.  (Tr. 259.)  Slayton further indicated that his prior prescription of Zoloft did not help, and then he lost his insurance and did not obtain further treatment.  (Tr. 260.)

Slayton admitted to "auditory hallucinations with homicidal and suicidal thoughts, command in nature and with his having strong feelings of wanting to act on the thoughts."  (Tr. 261.)  The diagnosis was major depressive disorder, single episode, severe with psychotic features, and personality disorder.  (Tr. 261-62.)  Slayton's GAF on admission was twenty-five and fifty at discharge.[6]  (Tr. 262.)

The physician noted that upon discharge on March 4, after two days of treatment, "the

---

[5]AMERICAN PSYCHIATRIC ASSOCIATION, *supra* note 4, at 4.

[6]A GAF score of twenty-five indicates that behavior is considerably influenced by delusion or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. DSM-IV-TR 34.  A GAF of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 34.

voices were virtually gone, his depression was gone, he had no suicidal ideation, no homicidal ideation, and felt ready to go home." (Tr. 262.) The doctor prescribed him Cogentin, Geodon, Zoloft, and Trazodone, and Slayton was ordered to follow up with Park Center. (Tr. 262.)

### 6. Dr. Kenneth Bundza, Consultative Mental Status Exam on March 22, 2004

Slayton saw Dr. Kenneth Bundza on March 22, 2004, for a consultative mental status exam. (Tr. 165.) Dr. Bundza discussed Slayton's emotional problems that "eventually erupted into a scenario where [Slayton] was experiencing both auditory and visual hallucinations" and that Slayton had suicidal and homicidal thoughts accompanied by persecutory and paranoid delusions. (Tr. 165.) Dr. Bundza acknowledged that Slayton had been hospitalized and was receiving case management services. (Tr. 165.) He observed that Slayton arrived on time, was properly groomed, had reasonably well-developed verbal communication skills, and that his overall behavior was appropriate, although his affect was constrained and flat. (Tr. 166.) He was cooperative and oriented, but had restricted arithmetic skills. (Tr. 166.) Dr. Bundza observed that Slayton "did not demonstrate any marked deficits in his judgment, common sense, or verbal abstract reasoning ability." (Tr. 166.)

Dr. Bundza determined that the results of the mental status examination did not "indicate the presence of any major cognitive or intellectual defects," but that Slayton "presents with a rather atypical scenario of what appears to be paranoid schizophrenia." (Tr. 167.) The doctor noted that although his symptoms recently developed, they were vivid and resulted in hospitalization. (Tr. 167.) His initial diagnosis was schizophrenia, paranoid type, as well as antisocial personality disorder. (Tr. 167-68.) Dr. Bundza assessed Slayton's GAF at forty.[7] (Tr.

---

[7]A GAF score of forty indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR 34.

168.)  On May 10, 2004, after reviewing the reports of Dr. Weiss and Dr. Baker at the state

agency's request, he determined that the MMPI-2 test results appeared consistent with a

diagnosis of paranoid schizophrenia.  (Tr. 169.)

### 7.  Psychiatric Review Technique Form by DDS physician Dr. J. Gange on October 14, 2003, affirmed by Dr. F. Kladder on May 12, 2004, with Mental Residual Functional Capacity Assessment

State agency doctor J. Gange, Ph.D., conducted a Psychiatric Review Technique Form

and Mental Residual Functional Capacity Assessment in October 2003, diagnosing Slayton with

depression and paranoid traits; there was also a question of malingering.  (Tr. 177, 186.)  Dr.

Gange deemed Slayton's allegations "partially credible," noting his invalid MMPI-2 profile,

daily drinking, and litigation with his former employer.  (Tr. 186.)  He concluded that although

Slayton has "a poor response to supervision, he retains the ability to complete simple, repetitive

tasks."  (Tr. 186.)  On May 12, 2004, Dr. Kladder affirmed Dr. Gange's opinion.  (Tr. 186.)

### 8.  Treatments at Park Center from March 2004 through February 2006

In March 2004, Slayton began to receive mental health treatment at Park Center,

including visits with a series of different psychiatrists for medication management, as well as a

case manager and a therapist.  (Tr. 199-220.)  Slayton's report of symptoms fluctuated during the

next two years.  At times, Slayton reported that he felt "significantly improved," that everything

was "going well" with his medication, that his medication was helping him with "no problem,"

that he was doing "much better" than before taking the medication, and that he "felt much better

than he used to," that he was "doing well," and that he had no hallucinations or homicidal or

suicidal thoughts.  (*E.g.,* Tr. 200, 202, 207, 208, 209, 210, 211, 212, 213, 215, 216.)  However,

other times, Slayton stated that he was still hearing voices, felt depressed, experienced bouts of

anxiety and paranoia, and at times had suicidal and homicidal thoughts.  (*E.g.,* Tr. 202, 203, 205,

208, 210, 212, 214, 215, 219.)  In any event, Slayton and Park Center agreed to discontinue his

psychotherapy in March 2005 because Slayton stated his appointments were hard to keep up

with and that he did not think the therapy was helping him.  (Tr. 211.)  In sum, Slayton had more

than thirty visits with a psychiatrist, a case manager, or a therapist at Park Center between March

2004 and September 2005.  (Tr. 200-16.)

On September 6, 2005, Slayton began seeing Dr. Vijoy Varma, yet another psychiatrist at

Park Center.  (Tr. 216.)  Slayton visited Dr. Varma again in October, and then on February 2,

2006, Dr. Varma filled out a Mental Impairment Questionnaire and Medical Source Statement of

Ability to Do Work-Related Activities at the behest of Slayton's attorney, indicating that he had

reviewed the reports of Drs. Baker, Weiss, and Bundza.  (Tr. 218, 274-78.)  Dr. Varma stated

that Slayton continued to be depressed, have "crazy thoughts" to hurt himself and others, and

hear voices telling him to do so.  (Tr. 274.)  His diagnosis was major depressive disorder with

psychotic features and personality disorder, listing symptoms including delusions or

hallucinations, suicidal ideation, paranoia, and difficulty thinking or concentrating.  (Tr. 274.)

He assessed Slayton's current and highest GAF over the past year at 50.[8]  (Tr. 274.)  He did not

think that Slayton was a malingerer, and stated that the medication caused moderate

improvement in Slayton's symptoms.  (Tr. 275.)  Dr. Varma's prognosis was guarded; he

expected Slayton's impairment to last at least twelve months, estimating that they would cause

him to be absent from work more than four days each month.  (Tr. 275.)

On the Medical Source Statement, Dr. Varma indicated that Slayton's abilities to

---

[8]A GAF of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR 34.

8

understand, remember, and carry out detailed instructions were poor, as were his abilities to

concentrate for extended periods and work around others without being distracted.  (Tr. 277.)

Dr. Varma believed that Slayton's impairment affected his ability to appropriately respond to

supervision, co-workers, and work pressures, and that his abilities to accept instructions and

respond to criticism or changes in the work setting are poor.  (Tr. 278.)  Dr. Varma based his

assessment on interview, patient's self report, mental status examination, and documented

history.  (Tr. 277-78.)  Dr. Varma indicated that Slayton cannot get along with co-workers,

believes people sabotage his work, and that Slayton "goes on in a rage."  (Tr. 278.)  Dr. Varma

noted Slayton's history of hallucinations, anxiety, panic, and problems with concentrating and

dealing with stress and criticism.  (Tr. 278.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[9]  *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer

---

[9] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

The ALJ rendered his decision on September 27, 2006.  (Tr. 12-19.)  At step one of the five step analysis, he found that Slayton had not engaged in any substantially gainful activity since his alleged onset date and at step two that Slayton had severe impairments of affective disorder, personality disorder, and substance abuse disorder.  (Tr. 14.)  At step three, the ALJ determined that Slayton's impairments did not meet or equal a listing.  (Tr. 14-15.)  Before proceeding to step four, the ALJ found Slayton's statements about the intensity, persistence, and limiting effects of his symptoms "not entirely credible" and that he has the following RFC: "[T]he claimant has no exertional limitations.  As a result of his mental impairments, the claimant retains the residual functional capacity to perform simple, repetitive tasks requiring only occasional dealings with supervisors, coworkers, and the general public." (Tr. 15.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Slayton could perform his past relevant work, and therefore Slayton was not disabled.  (Tr. 17-18.)  Alternatively, the ALJ determined at step five that Slayton could perform a significant number of jobs within the national economy, including a janitor, press machine operator, and assembler-automotive parts.  (Tr. 18.)  Therefore, Slayton's claim for DIB was denied.  (Tr. 19.)

### C.  The ALJ's Credibility Determination Will Be Reversed

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ first described Slayton's hearing testimony, including testimony about his daily activities, how his mental impairments affect his life, his drug and alcohol use, and his educational background. (Tr. 15-16.) The ALJ then made the following credibility determination:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. The evidence of record shows that the claimant had a long work history of earnings above substantial gainful activity . . . despite his probable long-term mental impairments. The claimant quit his last job and had litigation pending with his prior employer. The claimant's testimony that he has visual hallucinations twice a week and [hears] voices telling him to hurt himself and others four times a week are not supported by mental health treatment progress notes. The evidence of record confirms that when the claimant takes his medication as prescribed, he does well with no major complaints. Finally, the claimant did not seek mental health treatment until after he filed for disability benefits.

(Tr. 16.)

Slayton argues that the ALJ's reasoning regarding Slayton quitting his last job and his pending litigation was difficult to decipher, and that the ALJ failed to connect the dots. (Opening Br. 23, Reply Br. 4.)  In assessing Slayton's credibility, the ALJ reasoned that Slayton's symptom testimony was not entirely credible because "he quit his last job and had litigation pending with his prior employer[,]" but does not follow this assertion with any explanation indicating how quitting his last job at Enviro-Clean and having pending litigation erodes Slayton's credibility.  (Tr. 16.)  In fact, Slayton testified that he quit because he "[g]ot paranoid" and believed that somebody would sabotage his work, (Tr. 288, 305), and that he had problems concentrating.  (Tr. 304-05.)  That Slayton's mental problems may have caused him to quit his employment is seemingly supported by the extensive records documenting his paranoia and suspicion.  (*See, e.g.,* Tr. 154, 162-64, 167-68, 177, 186, 206, 208, 214.)  Consequently, the ALJ failed to build "an accurate and logical bridge from the evidence to [the] conclusion," *Steele*, 290 F.3d at 941, connecting Slayton's quitting and litigation with his credibility.

Slayton also maintains that the ALJ should not have discredited him on the basis of his testimony about his hallucinations because symptoms may vary, and the ALJ did not review the record to determine if there were explanations for the varying symptoms.  (Opening Br. 24.)  The ALJ reasoned that Slayton's "testimony that he has visual hallucinations twice a week and [hears] voices telling him to hurt himself and others four times a week are not supported by mental health treatment progress notes."  (Tr. 16.)  Slayton testified, "Well, I hear voices.  Some time I, I see things at times, well, most of the time."  (Tr. 297.)  He stated that he has visual hallucinations sometimes as much as twice a week and hears voices "frequently," not every day, but three or four times a week, and that they tell him to hurt himself and others.  (Tr. 297-98.)

Indeed, throughout the record, Slayton reported experiencing auditory and visual hallucinations.

To elaborate, each of the consultative physicians noted that Slayton admitted to experiencing hallucinations, (Tr. 154, 158, 165), and Slayton was even hospitalized after experiencing "auditory hallucinations with homicidal and suicidal thoughts, command in nature, and with his having strong feelings of wanting to act on the thoughts."  (Tr. 261.)  Furthermore, his subsequent treatment record at Park Center indicates that he heard voices or experienced hallucinations on a regular basis.  (Tr. 200, 203, 205, 214, 215, 218, 219.)  Dr. Varma also noted on the Mental Impairment Questionnaire that he had seen Slayton on January 24, 2006, and February 2, 2006, and that he "[c]ontinu[ed] to be depressed and to have 'crazy thoughts' to hurt self and others.  Also, voices tell him to do so."  (Tr. 274.)  Slayton's portrayal of the intensity and persistence of his symptoms clearly has support in the record, yet the ALJ impermissibly makes his conclusory determination to the contrary without addressing the seeming plethora of evidence supporting Slayton's allegations.  *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion.") (internal citation omitted); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

While Slayton's symptoms often fluctuated and the precise number of times per week he experienced them was apparently not recorded in the entries, the consistency with which he heard voices is evident and bolsters his testimony that he hears them "frequently" but not everyday.  Regardless, "the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible."  SSR 96-7p.  "Symptoms may vary in their intensity, persistence,

and functional effects, or may worsen or improve with time, and . . . . [t]herefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects."  SSR 96-7p.  Here, the ALJ made no effort to reconcile his finding about the severity of Slayton's symptoms with the documented complaints of hallucinations, nor did he address any explanations for their fluctuation.

Slayton also took issue with the ALJ's finding that when he is on prescription medication, "he does well with no major complaints."  (Opening Br. 24; Tr. 16.)  While Slayton often indicated that his medication was helping him, he also complained at times that it was not helpful or improving his symptoms, and the doctors had to adjust his medication multiple times. (Tr. 164, 202, 203, 205, 213, 265.)  Although Slayton at times stated that he feels better than he did prior to taking the medication, the record evidences that even when taking his medication, Slayton still frequently experienced depression, anxiety, hallucinations, and even homicidal and suicidal thoughts.  (Tr. 203, 205, 207, 210, 211, 212, 214, 215, 218.)  Consequently, the ALJ's determination that Slayton does better without "major complaints" when he is on his medicine is not grounded in the record.  *See Ray*, 843 F.2d at 1002.

Because he had problems affording treatment, Slayton argues that the ALJ erred in finding him less credible for waiting to seek treatment until after he applied for benefits. (Opening Br. 25.)  Although "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints," the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual

15

may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. Among these explanations is the claimant's ability to afford treatment or lack of access to free or low-cost medical services. *Id*. Indeed, the record indicates that Slayton initially had problems affording treatment. (Tr. 152, 158.)

To explain, Dr. Baker acknowledged Slayton's inability to afford counseling, (Tr. 152, 156), and Dr. Weiss noted that Slayton could not continue his therapy at Southwestern Indiana Mental Health Center because he had no money, and the one time he did go, he had to pawn jewelry to afford it. (Tr. 158.) Dr. Weiss further mentioned that Slayton stated that if he could obtain the money, he would resume treatment. (Tr. 158.) Moreover, once Slayton was able to afford treatment after his hospitalization at Parkview Health, he saw the doctor regularly and further kept up with appointments with his case manager, and for a time, his therapist, amounting to over thirty visits between March 2004 and the end of 2005. Thus, the ALJ's credibility finding was improper under SSR 96-7p because he discounted Slayton's symptom testimony on the basis that he only sought treatment after applying for benefits, without giving any indication that he considered the effect of Slayton's financial difficulties on his ability to seek treatment. *Neave v. Astrue*, No. 07-C0301, 507 F. Supp. 2d 948, 964 (E.D. Wis. Aug. 31, 2007) ("Courts have regularly held that inability to afford treatment constitutes a good reason for not seeking it.") (collecting cases).

Furthermore, as Slayton points out, his GAF scores reflect serious symptoms or serious impairment in social, occupational, or school functioning, or some impairment in reality testing of communication or major impairment in several areas, including work. (Opening Br. 25.)

16

Although the ALJ perfunctorily listed three of Slayton's GAF scores, he failed to articulate a

basis for rejecting this evidence.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)

(stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that

the ALJ considered the important evidence . . . .") (internal quotation marks and citation

omitted)); *Gillespie v. Barnhart*, No. 02 C 5172, 2003 WL 22232631, at *11 (N.D. Ill. Sept. 25,

2003) (remanding case where the ALJ listed some of the medical evidence, but "fail[ed] to

articulate his basis for either crediting or rejecting specific diagnoses and assessments favorable

to [p]laintiff").  Consequently, it is difficult to trace the ALJ's path of reasoning between

Slayton's GAF scores, which consistently reflect serious or major impairments, and his

conclusion that Slayton's testimony of severe limitations was not credible.[10]

Because the ALJ erred in failing to follow the SSR 97-6p mandate, selectively reviewed

evidence about the intensity and persistence of Slayton's symptoms, and otherwise failed to

build "an accurate and logical bridge from the evidence to [the] conclusion[,]"  *Steele*, 290 F.3d

at 941, remand in this instance is warranted.

D.  *The ALJ Improperly Evaluated the Opinion of Dr. Varma, Slayton's Treating Psychiatrist*

The Seventh Circuit has stated that "more weight is generally given to the opinion of a

treating physician because of his greater familiarity with the claimant's conditions and

circumstances."  *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this

---

[10]Slayton also took issue with the ALJ's reasoning that he "had a long work history of earnings above substantial gainful activity . . . despite his probable long-term mental impairments."  (Opening Br. 23; Tr. 16.) Slayton argues that his past mental problems were different than the current ones that developed into a disability, and therefore evidence of his past work history is essentially irrelevant. (Opening Br. 23.)  However, the ALJ is simply stating that despite his mental problems in the past, Slayton was able to function well enough to be gainfully employed, and the ALJ may consider a person's daily living activities in assessing credibility.  *See generally Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (finding that the ALJ properly considered the claimant's daily activities, among other factors, when assessing credibility). Though the ALJ's rationale on this point appears reasonable, this reason standing alone is inadequate to remedy the ALJ's faulty credibility analysis.

principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a

medical condition is [only] entitled to controlling weight if it is well supported by medical

findings and not inconsistent with other substantial evidence in the record."  *Clifford*, 227 F.3d at

870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

2002).  In the event the treating physician's opinion is not well supported or is inconsistent with

other substantial evidence, the Commissioner must apply the following factors to determine the

proper weight to give the opinion: (1) the length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment relationship; (3) how much supporting

evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner.  20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th

Cir. 1996).

Slayton argues that the ALJ erred in evaluating the opinion of Dr. Varma, Slayton's

treating psychiatrist, and ultimately, substantial evidence does not support ALJ's determination.

In assigning Dr. Varma's opinion "very little weight," the ALJ specifically reasoned:

> Dr. Varma checked on a form that the claimant would miss more than four days a
> month of work but then went on to indicate that the patient could manage benefits
> in his own best interests.  Also . . . Dr. Varma provided a Medical Source
> Statement of Ability To Do Work-Related Activities marking as "poor" the
> claimant's ability to understand, remember, and carry out detailed instructions;
> maintain attention and concentration for extended periods; work with or near
> others; accept instructions and criticism from supervisors; and respond
> appropriately to changes in the work setting.  He indicated that his responses were
> supported by claimant's self-report, documented history, and mental status
> examination.  He stated that the claimant cannot get along with coworkers and
> feels people are deliberately sabotaging his work and he goes into a rage.  He said
> that the claimant has a history of hallucinations, is prone to anxiety and panic, is
> unable to concentrate or focus well, and is unable to tolerate stress, supervision,
> or criticism.  Because Dr. Varma's opinion was based primarily upon the

claimant's own self report of symptoms, and the forms appear to have been prepared at the request of the claimant's attorney (because Dr. Varma had only seen the claimant two times for only 15 minutes each time), his opinion has been given very little weight.[11]

(Tr. 17.)

The ALJ began by highlighting what he viewed as an internal inconsistency within Dr. Varma's report, that although Slayton would miss more than four days of work, he is capable enough to manage his benefits.  (Tr. 17.)  *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").  However, Dr. Varma's assessment of Slayton's absenteeism is not necessarily inconsistent with his capability of managing his own funds.  In fact, two of the consultative physicians deemed that Slayton's impairments did not interfere with his ability to do so. (Tr. 156, 167.)  Furthermore, Dr. Bundza noted that Slayton "did not demonstrate any marked deficits in his judgment, common sense, or verbal abstract reasoning ability" and that the mental status exam results "do not indicate the presence of any major cognitive or intellectual deficits." (Tr. 166-67.)  The record shows that Slayton's psychological problems (such as his paranoia and hallucinations), on the other hand, seemingly impact his ability to interact with others, which would relate to his ability to maintain employment.  Slayton's cognitive ability to handle *his own affairs* is not, then, overtly inconsistent with his psychological problems interacting with *others* in the workplace.

---

[11]Ultimately, the ALJ chose to assign "significant" and "great" weight to the opinions of the state agency psychologists. In particular, ALJ explained that "[t]heir opinions were based on objective findings of an invalid MMPI-II profile, the claimant's continued alcohol abuse, and the fact that the claimant was in litigation with his former employer." (Tr. 17.)  The ALJ further justified the great weight he gave the opinions of the state agency doctors, pointing out that "[t]heir opinions are also consistent with the claimant's long work history with earnings above substantial gainful activity."  (Tr. 17.)

19

The ALJ also reasoned that Dr. Varma's opinion was entitled to less weight in part because it "was based primarily upon the claimant's own self-report of symptoms[.]"  (Tr. 17.) Slayton, however, argues that Dr. Varma relied upon more than mere self-reports; he also relied on documented history, mental status exams, and interviews.

Indeed, the ALJ may discount a medical source opinion based upon the claimant's subjective report of symptoms, rather than medically acceptable clinical and laboratory diagnostic techniques.  *See* SSR 96-2p; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on the claimant's subjective complaints); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000).  Here, however, Dr. Varma *explicitly stated* that he relied upon more than mere self-reports, but also the reports of the consultative physicians Dr. Baker, Dr. Weiss, and Dr. Bundza, (Tr. 274), as well as *interview, mental status examination, and documented history*.  (Tr. 277-78.)  Therefore, the ALJ's reasoning that "Dr. Varma's opinion was based primarily upon the claimant's own self-report of symptoms" is flawed.  Furthermore, "[a] patient's report of complaints, or history, is an essential diagnostic tool[,]" *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997), and Slayton's problems are psychiatric in nature, which are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment," *Poulin v. Bowen*, 817 F.2d 865, 873-74 (C.A.D.C. 1987).

Next, the ALJ discounted Dr. Varma's opinion in part because "the forms [Dr. Varma filled out] appear to have been prepared at the request of the claimant's attorney (because Dr. Varma had only seen the claimant two times for only 15 minutes each time)[.]"  (Tr. 17.)  *See* 20 C.F.R. § 404.1527(d)(2)(i) ("Generally, the longer a treating source has treated you and the more

20

times you have been seen by a treating source, the more weight we will give to the source's

medical opinion."). However, the record reflects that Dr. Varma actually met with Slayton *four*

*times*, for twenty to twenty-five minutes per session.[12] Although the Park Center progress notes

include only two visits with Dr. Varma, once on September 21, 2005, (Tr. 216), and another on

November 8, 2005, (Tr. 218), Dr. Varma's Mental Impairment Questionnaire also states that

Slayton was last seen on January 24, 2006, and February 2, 2006, the date of the report.[13]  (Tr.

274.) Therefore, the record does not support the ALJ's determination that Dr. Varma only

briefly visited with Slayton twice.

        In sum, because the ALJ failed to demonstrate that the opinion of Dr. Varma, Slayton's

treating psychologist, was not "well supported by medical findings and . . . inconsistent with

other substantial evidence in the record[,]" *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §

404.1527(d)(2), and because substantial evidence did not support his reasoning, the ALJ

improperly analyzed the doctor's opinion.  Accordingly, a remand is required.

## VI. CONCLUSION

        For the reasons articulated herein, the decision of the Commissioner is REVERSED, and

the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[12]While the ALJ correctly noted earlier in his opinion that Slayton's visits with Dr. Varma lasted about twenty to twenty-five minutes, the ALJ, in his evaluation of the medical evidence, incorrectly stated that "Dr. Varma had only seen the claimant two times for only 15 minutes each time[.]" (Tr. 15, 17.)

[13]Dr. Varma's report states, "Last seen on 01/24/2006 [and] today.  Continuing to be depressed and to have 'crazy thoughts,' to hurt self and others.  Also, voices tell him to do so."  (Tr. 274.)

Opinion.  The Clerk is directed to enter a judgment in favor of Slayton and against the

Commissioner.

       SO ORDERED.

       Enter for this 13th day of February, 2008.

                                    S/Roger B. Cosbey                           
                                    Roger B. Cosbey,
                                    United States Magistrate Judge